UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

AIMEE KHATIB, as PERSONAL
REPRESENTATIVE of
ESTATE OF JASON ROTHE,

              Plaintiff,

   v.

MATTHEW MILLAR,
LESLY-ANN COSGRO;
PAUL SANCHEZ;
JENNIFER FITZGERALD,
TIMOTHY WRIGHT;
JOSEPHINE MCDONOUGH;
MARIA BISSONNETTE,
HELEN HANKS, and
NEW HAMPSHIRE DEPARTMENT OF
CORRECTIONS

              Defendants.

Civil Action No.

JURY TRIAL DEMANDED

## COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

NOW COMES Plaintiff, Aimee Khatib, as Personal Representative of the Estate of Jason Rothe, (hereinafter "the Estate" or "Mr. Rothe"), by and through her attorneys, Shaheen & Gordon, P.A., and pursuant to 42 U.S.C. § 1983 and New Hampshire state law, makes the following complaint against the below named current or former correctional officers, Department of Corrections staff, and state entities: former Correctional Officer Matthew Millar ("CO Millar"); Corporal Lesly-Ann Cosgro ("Cpl. Cosgro"); Corporal Timothy Wright ("Cpl. Wright"); Correctional Officer Paul Sachez ("CO Sanchez"); Correctional Officer Josephine McDonough ("CO McDonough"); Correctional Officer Maria Bissonnette ("CO Bissonnette"), (collectively "the COs"); Registered Nurse Jennifer Fitzgerald ("RN Fitzgerald"); former Department of

Corrections Commissioner Helen Hanks ("Commissioner Hanks"); and the New Hampshire Department of Corrections ("DOC") (collectively, "Defendants"), in their individual capacities (or through *respondeat superior*) for violating Mr. Rothe's clearly established Fourteenth Amendment rights to due process, including his right not to be subjected to excessive force, when Mr. Rothe was wrongfully killed by the COs. Among other things, these tortious, constitutional violations occurred when one or more of the COs and/or RN Fitzgerald:

- used unlawful force, including kneeling on his back, deploying multiple tasers to his body, striking him repeatedly in the head, ultimately causing his death;

- failed to comply with departmental policy once Mr. Rothe was subdued and restrained, by leaving him in a prone position and further utilizing the restraint stretcher, contributing to his death;

- failed to follow departmental policies regarding the provision of medical care and/or duty to intervene such that Mr. Rothe died after being subdued via the application of excessive force, restrained in the prone position, and transported via stretcher restraints without immediate medical evaluation;

For her part, Commissioner Hanks, as head of the NH Department of Corrections, failed to take appropriate reporting, investigating, and disciplinary measures to address this egregious, unconstitutional conduct and permitted a pattern or practice of excessive force to develop within the ranks, at least in part by engaging in a pattern or practice of failing to properly train COs in proper and constitutional use of force and to follow policies related to disciplining COs for violations of departmental policies. In addition, Commissioner Hanks interfered in the investigation of Mr. Rothe's death conducted by the NH State Police and the NH Attorney

General's Office Criminal Bureau by conducting her own unauthorized interviews of witnesses and shredding her notes.

The Estate seeks damages arising out of these serious constitutional violations.

## JURISDICTION AND VENUE

1.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 over the Estate's federal causes of action arising under 42 U.S.C. § 1983 *et seq.* This Court has supplemental jurisdiction over the Estate's state law claims. *See* 28 U.S.C. § 1367.

2.     This Court may exercise personal jurisdiction over all Defendants because they resided or did business within the District of New Hampshire at all times relevant to this matter.

3.     Proper venue lies in the District of New Hampshire because a substantial part of the events giving rise to the Estate's claims occurred in Concord, New Hampshire. 28 U.S.C. § 1391(b).

## PARTIES

4.     Mr. Rothe was a 50-year old man, committed to the New Hampshire State Hospital in 2019. In 2022 he was transferred to the Secure Psychiatric Unit, located within the New Hampshire State Prison for Men in Concord, NH. On April 29, 2023, Mr. Rothe died as a result of the combined effects of compressional and positional asphyxia after he was forcibly restrained by the Defendant COs. His death was ruled a homicide by the State's medical examiner.  At all times relevant to this lawsuit, Mr. Rothe resided at the New Hampshire State Prison located at 281 N State St., Concord, NH 03301.  Aimee Khatib, Personal Representative of the Estate of Jason Rothe resides at 240 State Street, Apt. 409, Schenectady, NY  12305.

5.       Correctional Officer Matthew Millar ("CO Millar"), at all times relevant to this lawsuit, was a Correctional Officer employed by the New Hampshire Department of Corrections working in the Secure Psychiatric Unit located at the New Hampshire State Prison for Men. CO Millar is, or was at all times relevant to this lawsuit, acting under the color of state law as a correctional officer employed by the New Hampshire Department of Corrections. CO Millar is being sued in his individual capacity. At all times relevant to this lawsuit, CO Millar was and is a "person" as that term is used by 42 U.S.C. § 1983.  At all times relevant to this lawsuit, CO Millar resided at 7 Queen St., Boscawen, NH 03303, which is CO Millar's last known address.

6.       Corporal Lesly-Ann Cosgro ("Cpl. Cosgro"), at all times relevant to this lawsuit, was a Corporal employed by the New Hampshire Department of Corrections working in the Secure Psychiatric Unit located at the New Hampshire State Prison for Men. Cpl. Cosgro is, or was at all times relevant to this lawsuit, acting under the color of state law as a correctional officer employed by the New Hampshire Department of Corrections. Cpl. Cosgro is being sued in her individual capacity. At all times relevant to this lawsuit, Cpl. Cosgro was and is a "person" as that term is used by 42 U.S.C. § 1983.  At all times relevant to this lawsuit, Cpl. Cosgro resided at 155 Butter Rd, Henniker, NH 03242, which is Cpl. Cosgro's last known address.

7.       Corporal Timothy Wright ("Cpl Wright"), at all times relevant to this lawsuit, was a Corporal employed by the New Hampshire Department of Corrections working in the Secure Psychiatric Unit located at the New Hampshire State Prison for Men. Cpl Wright is, or was at all times relevant to this lawsuit, acting under the color of state law as a correctional officer employed by the New Hampshire Department of Corrections. Cpl Wright is being sued in his individual capacity. At all times relevant to this lawsuit, Cpl Wright was and is a "person" as that term is used

by 42 U.S.C. § 1983. At all times relevant to this lawsuit, Cpl. Wright resided at 18 Oakwood Cir. Apt. 5, Goffstown, NH 03045, which is Cpl. Wright's last known address.

8.    Correctional Officer Paul Sanchez ("CO Sanchez"), at all times relevant to this lawsuit, was a Correctional Officer employed by the New Hampshire Department of Corrections, working in the Secure Psychiatric Unit located at the New Hampshire State Prison for Men. CO Sanchez is, or was at all times relevant to this lawsuit, acting under the color of state law as a correctional officer employed by the New Hampshire Department of Corrections. CO Sanchez is being sued in his individual capacity. At all times relevant to this lawsuit, CO Sanchez was and is a "person" as that term is used by 42 U.S.C. § 1983. At all times relevant to this lawsuit, CO Sanchez resided at 231 South Main St, Laconia, NH 03246, which is CO Sanchez's last known address.

9.    Correctional Officer Josephine McDonough ("CO McDonough"), at all times relevant to this lawsuit, was a Correctional Officer employed by the New Hampshire Department of Corrections, working in the Secure Psychiatric Unit located at the New Hampshire State Prison for Men. CO McDonough is, or was at all times relevant to this lawsuit, acting under the color of state law as a correctional officer employed by the New Hampshire Department of Corrections. CO McDonough is being sued in her individual capacity. At all times relevant to this lawsuit, CO McDonough was and is a "person" as that term is used by 42 U.S.C. § 1983. At all times relevant to this lawsuit, CO McDonough resided at 27 Lovers Lane Rd, Chichester, NH 03258, which is CO McDonough's last known address.

10.    Correctional Officer Maria Bissonnette ("CO Bissonnette"), at all times relevant to this lawsuit, was a Correctional Officer employed by the New Hampshire Department of Corrections, working in the Secure Psychiatric Unit located at the New Hampshire State Prison

for Men. CO Bissonnette is, or was at all times relevant to this lawsuit, acting under the color of state law as a correctional officer employed by the New Hampshire Department of Corrections. CO Bissonnette is being sued in her individual capacity. At all times relevant to this lawsuit, CO Bissonnette was and is a "person" as that term is used by 42 U.S.C. § 1983. At all times relevant to this lawsuit, CO Bissonnette resided at 22 Colby Ct, Laconia, NH 03246, which is CO Bissonnette's last known address.

11.     Registered Nurse Jennifer Fitzgerald ("RN Fitzgerald"), at all times relevant to this lawsuit, was a Registered Nurse employed by the New Hampshire Department of Corrections, working in the Secure Psychiatric Unit located at the New Hampshire State Prison for Men. RN Fitzgerald is, or was at all times relevant to this lawsuit, acting under the color of state law as a correctional nurse employed by the New Hampshire Department of Corrections. RN Fitzgerald is being sued in her individual capacity. At all times relevant to this lawsuit, RN Fitzgerald was and is a "person" as that term is used by 42 U.S.C. § 1983. At all times relevant to this lawsuit, RN Fitzgerald resided at 21 Bell St, Nashua, NH 03064, which is RN Fitzgerald's last known address.

12.     Department of Corrections Commissioner Helen Hanks ("Commissioner Hanks"), at all times relevant to this lawsuit, was the Commissioner of the New Hampshire Department of Corrections. Commissioner Hanks is, or was at all times relevant to this lawsuit, acting under the color of state law and provided executive leadership and direction to the Department. Commissioner Hanks is being sued in her individual capacity. At all times relevant to this lawsuit, Commissioner Hanks was and is a "person" as that term is used by 42 U.S.C. § 1983.  At all times relevant to this lawsuit, Commissioner Hanks resided at 37 Brook Rd, Tilton, NH 03276, which is Commissioner Hanks' last known address.

13.     New Hampshire Department of Corrections ("DOC") is the employer of all previously named Defendants.  NHDOC presides over the state's prison system, including the Secure Psychiatric Unit located at the New Hampshire State Prison for Men in Concord, New Hampshire.  The DOC is sued in its capacity as the liable employer for the above-named defendants. The NH Department of Corrections Headquarters is physically located at 64 South Street, Concord, NH 03302, with a mailing address of: PO Box 1806, Concord, NH 03302-1806.

**FACTS**

14.     Mr. Rothe was born in 1972 and was diagnosed with schizophrenia (Schizoaffective Disorder) around the age of 19.

15.     Over the years, Mr. Rothe struggled with his illness.  He was hospitalized several times in both Maine and New Hampshire.

16.     In 2017 Mr. Rothe was admitted to New Hampshire Hospital (NHH) due to the severity of his mental illness.

17.     In 2018, NHH petitioned the 6th Circuit-Probate Division in Concord, NH to have a guardian appointed for Mr. Rothe.  In its petition, NHH stated:

> Mr. Rothe suffers from Schizoaffective Disorder but refuses to take prescribed psychiatric medications unless required to do so. Without medications he is unable to care for himself, manage his ADLs, or adequately maintain his colostomy bag. He has been unable to weigh the risks and benefits of treatment, to understand what is likely to happen if he is not treated appropriately, or to enter into discussions to develop a rational discharge plan. On 3/21/18 he continued to be delusional, believing that he is rich and owns hotels in which he could stay, and became enraged when those beliefs were challenged. He was disruptive and hostile to staff and other patients, and continued to be grandiose, persecutory, labile, oppositional, and unable to be redirected. A guardian would be able to make treatment, discharge planning, and long-term care decisions that he is incapable of making.

18.     Upon information and belief, the Court granted NHH's Petition and appointed the Office of the Public Guardian ("OPG") to act as Mr. Rothe's guardian.

19.     In August 2022, Mr. Rothe was transferred from NHH to the Secure Psychiatric Unit (SPU) due to the likelihood that Mr. Rothe would cause harm to himself or others.

20.     The SPU is a unit of the New Hampshire Department of Corrections ("NHDOC") and is located on the grounds of the New Hampshire State Prison for Men ("NHSP") in Concord. The SPU is a separate and distinct unit that is overseen by the Director of Medical and Forensics, who is an employee of NHDOC.

21.     The SPU is the most intensive and secure inpatient treatment facility in the state behavioral health service delivery system.

22.     The SPU is designated to serve those having acute psychiatric needs that must be served in a secure inpatient setting. This includes individuals who may have committed crimes and have been found not competent to stand trial, those who committed no crimes but were civilly committed due to mental illness and are too dangerous to themselves or others to remain at NHH, individuals who were found not guilty by reason of insanity, and those rare individuals committed under the state's sexually violent predator law. The SPU also houses individuals who are developmentally disabled requiring intervention for extreme dangerousness.

23.     The SPU, while serving as an inpatient treatment facility for individuals who are significantly mentally ill, is a unit of the NHDOC, rather than a unit of NH Department of Health and Human Services, like NHH, and is staffed primarily with Correctional Officers, not with nurses, social workers, LNAs, or doctors (although a patient's treatment team does include social workers, nurses, a psychiatrist or advanced practice registered nurse (APRN), and a psychologist, as well as Correctional Officers).

24. The facility is secure, meaning patients are locked in the unit, and are not permitted to walk freely about the unit. They are escorted from their cells to other parts of the unit. They are often, if not always, handcuffed when they leave their cells. And while they are considered patients, for all intents and purposes, they are inmates.

25. For example, visitors, use of the telephone, use of mail, and acquisition of additional personal property are all governed by the same rules that inmates of NHSP must follow. See Inmate Handbook pp 19-25 (the Inmate Handbook is a publicly available document and is incorporated by reference into the Complaint herein). And patients who violate the rules of the SPU are disciplined according to the same set of rules that govern the classification and discipline of inmates. SPU Handbook p.16 (the SPU Handbook is a publicly available document and is incorporated by reference into the Complaint herein).

26. Patients are informed that "Correctional officers are on constant alert for rule violations, unsafe acts, and contraband control. If you are given instructions by a correctional officer you are to do what is asked first. You can complain about it later to the shift sergeant, unit lieutenant or SPU administrator." SPU Handbook p.7.

27. As of April 29, 2023, Mr. Rothe was housed in the Infirmary Ward, the most restrictive ward within the SPU.

28. On April 29, 2023, at 9:03 AM CO Sanchez brought Mr. Rothe to the Infirmary Dayroom. Upon information and belief, patients were allowed to use the dayroom as a break from having to otherwise remain in their cells.

29. The Infirmary Dayroom had cement and/or metal seats and tables that were bolted to the floor. There were no electronics or loose objects that could pose a danger to Mr. Rothe or any other person.

- 9 -

30. The door to the Dayroom was locked when Mr. Rothe was inside, and could only be unlocked by the officer in the control room, or by a CO with the keys.

31. Mr. Rothe, and other Infirmary patients, were generally permitted to use the Dayroom for one hour per day. However, upon information and belief, it was not unusual for the COs to permit patients to remain in the room longer if no other patient wanted to use it.

32. On April 29, 2023, Mr. Rothe was allowed to stay in the Dayroom beyond his allotted one-hour limit.

33. At some point, CO Millar ordered Mr. Rothe to return to his cell. Mr. Rothe did not want to leave the Dayroom and refused CO Millar's order. At 12:35 PM, CO Millar called for Mr. Rothe to be extracted from the Dayroom.

34. Rather than extract Mr. Rothe at that point, Cpl. Cosgro, the Officer in Charge (OIC) and Shift Supervisor on April 29, 2023, decided she would attempt to de-escalate the situation and persuade Mr. Rothe to voluntarily return to his cell.

35. Cpl. Cosgro requested that CO McDonough accompany her to the Dayroom, as CO McDonough had good rapport with Mr. Rothe.

36. While Cpl. Cosgro and CO McDonough were talking with Mr. Rothe, he was exhibiting signs of severe mental illness, to include making statements that he hadn't eaten in weeks, that he was being tortured, and that he has been held for several years.

37. Techniques they had used in the past to calm him down were unsuccessful. After approximately 10 minutes of attempted de-escalation, Cpl. Cosgro made the decision that they would extract Mr. Rothe from the Dayroom.

38. Extractions are considered a Use of Force, and as such are governed by DOC Policy and Procedure Document ("PPD") 382. PPD 382 sets forth two use of force options: immediate

action and delayed action. Immediate action is used when an inmate's actions are causing a potentially dangerous situation for themselves, other inmates, or staff. Examples include assault, escape, or self-harming behaviors. Delayed action is preferred by DOC because it allows for intervention by a team leader or Shift Commander to utilize crisis intervention techniques to de-escalate the situation.

39.    PPD 382 requires the Shift Commander and/or the Warden be notified of any use of force.

40.    PPD 383 requires that "incidents shall be video recorded . . . that may involve the use of physical force; [or] . . . the use of the Restraint Chair or stretcher restraint." PPD 383, IV. B (1) and (7). (PPD 383 is a publicly available document and is incorporated by reference into the Complaint herein).

41.    Extractions are supposed to be staffed with a total of seven people: One officer on the extraction shield, one officer on the upper left, one officer on the upper right, one officer on the lower left, one officer on the lower right, one team leader, and one camera operator.



42.     Video recording is to be used during the entire incident. It is the Shift Commander's responsibility to ensure that all incidents that are required to be video recorded are done so properly. PPD 383 IV.A.

43.     Upon information and belief, PPD 382 requires involvement of non-uniformed staff, such as a nurse, prior to conducting an extraction.

44.     On April 29, 2023, Cpl. Cosgro assembled an extraction team that consisted of only five people: Cpl. Wright, CO McDonough, CO Sanchez, CO Bissonnette, and Cpl. Cosgro herself.

45.     Although Cpl. Cosgro was aware of an incident occurring on April 16, 2023, where Mr. Rothe punched another CO in the face during the course of a cell extraction, Cpl. Cosgro did not believe Mr. Rothe would resist their extraction attempts, and treated the extraction not as a full

use of force incident, but more like a show of force: that if Mr. Rothe saw they were prepared to use force, he would back down and submit.

46. Cell extractions in SPU are very common. In the course of her time in SPU, Cpl. Cosgro had been involved in over 20 extractions, including extractions that were not fully staffed.

47. The team prepared to enter the Dayroom at 12:51 PM. No non-uniformed staff member was involved prior to the assemblage of the extraction team.

48. Typically, the Shift Supervisor or Team Leader would be the person who opens the door. However, Cpl. Cosgro instructed CO McDonough to open the door.

49. Despite DOC Policy on cell extractions requiring the use of a shield, Cpl. Cosgro did not instruct any member of the extraction team to have a shield. Rather it was Cpl. Wright's idea to utilize a shield. He was designated as the person to enter the dayroom first.

50. Cpl. Cosgro obtained a taser, and her role was to enter the dayroom after Cpl. Wright and tase Mr. Rothe if necessary.

51. CO Sanchez and CO McDonough were to enter the Dayroom after Cpl. Cosgro.

52. Cpl. Cosgro assigned CO Bissonnette to video recording duty because she was the least experienced officer on the extraction team. CO Bissonette utilized a handheld camcorder that she obtained from the security office at 12:50 PM.

53. While there was an order established to enter into the Dayroom, Cpl. Cosgro did not ensure that her team was wearing protective gear, did not conduct a pre-entry briefing, and did not assign roles to the members of the extraction team as "it wasn't that type of extraction." Instead the extraction team just knew generally they were to get Mr. Rothe on the ground and handcuffed.

54. Prior to entering the Dayroom, Mr. Rothe stuck an aggressive posture, and put his fists up in a fighting stance, and stated he would kill them if they came in the room, and he would

take the taser if they entered. These threats indicated he was not going to submit to the show of force, but rather that the COs would have to use force to gain compliance and extract him from the Dayroom.

55.     Rather than reconsider her decision to utilize an understaffed and underprepared extraction team, Cpl. Cosgro decided to continue with the extraction.

56.     CO Bissonnette turned on the handheld video recorder, and then CO McDonough unlocked and opened the Dayroom door. Chaos ensued immediately. Mr. Rothe immediately grabbed Cpl. Wright by the head and tried to pull him down to the ground. Cpl. Wright dropped his shield and began punching Mr. Rothe.

57.     As Cpl. Wright was attempting to gain control over one of Mr. Rothe's limbs, Cpl. Cosgro repeatedly utilized her taser. She used the "drive-stun" feature of the taser, a function designed to gain compliance by inducing pain, a total of eight times. Drive stuns alone do not cause neuromuscular incapacitation, and thus the repeated use of the taser by Cpl. Cosgro did not provide any windows of opportunity to establish control over Mr. Rothe and handcuff him while he was incapacitated. It merely caused Mr. Rothe pain, and he continued to fight.

58.     CO McDonough initially attempted to grab Mr. Rothe by the right bicep, which was ineffective in gaining control of him. She then tried to gain compliance over Mr. Rothe by pulling his hair, which was again, ineffective. Ultimately she moved behind Mr. Rothe as he was fighting Cpl. Wright and grabbed his legs to bring him to the ground.

59.     Mr. Rothe fell backwards and landed on top of CO McDonough's legs; CO Wright also fell to the ground; CO Wright and Mr. Rothe continued to engage in an active struggle. While CO McDonough is pinned to the ground by Mr. Rothe, Cpl. Cosgro continued to aggressively use her taser. Cpl. Cosgro was so indiscriminate in her use of the taser that she tased CO McDonough

at one point. Meanwhile, Cpl. Wright was straddling Mr. Rothe and punching Mr. Rothe in the face and head.

60.     CO Bissonnette, whose assigned role was to video record the entire encounter per PPD 383, decided that the situation was not at all under control and rather than continue to record the incident, she put the camera down and jumped in to help.

61.     The camera stopped recording 1 minute and 16 seconds into the altercation.

62.     CO Bissonnette grabbed hold of Mr. Rothe's legs while Cpl. Wright was straddling Mr. Rothe, repeatedly punching Mr. Rothe in the head. CO Sanchez was attempting to gain control of Mr. Rothe's right arm.

63.     At 12:52 PM, approximately 1 minute after the extraction team entered the Dayroom, CO Millar, who was not on the extraction team, entered the Dayroom. He took over control of Mr. Rothe's legs from CO Bissonnette.

64.     CO Bissonnette did not resume video recording of the incident. Rather, she proceeded to lockdown the rest of the unit at Cpl. Cosgro's command.

65.     Ultimately, CO McDonough was able to extricate herself from beneath Mr. Rothe. The COs in the room, including now CO Millar, rolled Mr. Rothe onto his stomach, placing him in a prone position on the floor

66.     Once on his stomach, CO Millar moved from controlling Mr. Rothe's legs to Mr. Rothe's upper right shoulder.

67.     CO McDonough attempted to handcuff Mr. Rothe while he remained face down on the concrete floor. After cuffing his left arm, Mr. Rothe managed to pull his arm, with the cuff attached, back under his body. CO McDonough then struck Mr. Rothe in the head with her radio

to gain his compliance. Recognizing that was an excessive use of force, she switched to hitting him on the hand and arm with her radio.

68.     Cpl. Cosgro again administered a drive-stun to Mr. Rothe with her taser, which again, was ineffective as that function does not cause neuromuscular incapacitation.

69.     CO Millar and Cpl. Wright both attempted to subdue and restrain Mr. Rothe by controlling his upper body—CO Millar remained on Mr. Rothe's upper right shoulder area, placing a knee on Mr. Rothe's back. Cpl. Wright attempted to control Mr. Rothe's left upper body.

70.     CO Millar gave CO McDonough a second set of cuffs, and Mr. Rothe was cuffed behind his back, while still remaining face down on the ground. CO Millar and Cpl. Wright continued to keep pressure on Mr. Rothe after he was cuffed, even though once he was cuffed, Mr. Rothe stopped actively resisting.

71.     RN Fitzgerald entered the dayroom at 12:55 PM, after Mr. Rothe was placed in a prone position and cuffed. RN Fitzgerald did not at that time make any observations that Mr. Rothe was in distress, nor did she order the COs to place him in a recovery position (i.e. roll him to his side). RN Fitzgerald left the Dayroom almost immediately.

72.     At 12:55 PM, CO McDonough left the Dayroom and obtained a set of leg irons to further restrain Mr. Rothe. When she returned, 26 seconds later, CO Millar and Cpl. Wright were still physically restraining Mr. Rothe, even though he was no longer struggling. CO McDonough then applied the leg irons to Mr. Rothe.

73.     RN Fitzgerald returned to the Dayroom with CO Sanchez at 12:58 PM with the restraint stretcher. Mr. Rothe was then moved from the floor by COs to the restraint stretcher. Mr. Rothe was placed on the stretcher—still face down, still cuffed, and still within leg shackles—and strapped down before he was transported to the four-point restraint room.

74.     Upon information and belief, at all times relevant, NHDOC did not have a written policy about the use of the restraint stretcher, nor were COs trained in its use. Nonetheless, it was used repeatedly in the SPU, such that it was a custom or practice of SPU staff to utilize the stretcher despite no policy or specific training.

75.     Only the nurse on duty can make the call to move a person to the four-point restraint room and RN Fitzgerald determined Mr. Rothe would be moved to the four-point room via the restraint stretcher. Mr. Rothe was left prone on the stretcher during his move to the four-point restraint room.

76.     Within the four-point restraint room there is a restraint table upon which inmates/patients are placed and each of their arms and legs are shackled to the table.

77.     The COs moved Mr. Rothe from the restraint stretcher to the four-points restraint table, keeping him in a facedown position. At 1:01 PM, as the COs were preparing to remove the handcuffs and shackles from Mr. Rothe, and place him in the restraints on the table, CO McDonough checked Mr. Rothe's pulse and was unable to find one. CO McDonough then placed her hand on Mr. Rothe's back to see if he was breathing, and found he was not moving. CO McDonough then told the COs in the room that Mr. Rothe was not breathing. Cpl. Wright checked for a pulse.

78.     It was only then, 10 minutes after the botched extraction began, and approximately 9 minutes after Mr. Rothe was first placed in a face-down prone position, that Mr. Rothe was transitioned to a face-up position. Mr. Rothe was moved from the stretcher to the floor, and COs performed CPR.

79.     RN Fitzgerald arrived with an AED machine. The AED audibly yelled "shock is not advised." One reason an AED will not administer a shock is if the heart has stopped all together, and there is no electrical activity to shock back into normal rhythm.

80.     COs Millar and Aulis continued to administer CPR until EMTs arrived. COs Millar and McDonough then rode in the ambulance with Mr. Rothe to Concord Hospital where emergency department doctors continued CPR. They were unable to resuscitate Mr. Rothe and he was pronounced dead.

81.     An autopsy of Mr. Rothe was conducted on April 29, 2023, by NH Deputy Chief Medical Examiner Mitchell Weinberg, MD, which determined that Mr. Rothe died of compressional and positional asphyxia, and his death was ruled a homicide.

82.     Dr. Weinberg further determined that Mr. Rothe was dead at the time he was placed on the restraint stretcher as there were no signs of life visible once he was placed on the stretcher.

83.     Dr. Emma Lew, an expert hired by defense counsel in the criminal case, provided a second opinion regarding Mr. Rothe's cause of death, finding he died suddenly after prolonged exertion and restraint in a prone position with asphyxia contributing to his death, along with complications from obesity, cardiomegaly and schizoaffective disorder.

<u>Post Incident Investigation by NHDOC</u>

84.     Upon information and belief, prior to the end of their shifts on April 29, 2023, all involved staff including Cpl. Cosgro, Cpl., Wright, CO Bissonnette, CO McDonough, CO Sanchez, and CO Millar, wrote statements or incident reports regarding their involvement.

85.     Upon information and belief, the above-named involved staff were then placed on paid administrative leave.

86.    Upon information and belief, the New Hampshire State Police immediately commenced a criminal investigation into Mr. Rothe's death. On May 2, 2023, the NH Attorney General's Office notified Commissioner Hanks that the State Police were investigating Mr. Rothe's death. Commissioner Hanks was aware that the COs placed on leave were considered potential witnesses.

87.    Despite being aware of the State Police criminal investigation, Commissioner Hanks and Captain Scott Marshall held "use of force" review meetings with Cpl. Cosgro, Cl, Wright, CO Bissonnette, CO McDonough, CO Sanchez, and CO Millar prior to permitting these officers to return to work. Commissioner Hanks relied upon incomplete reports from the investigation department, and she completed performance reviews of the involved staff.

88.    Despite being aware of the criminal investigation, Commissioner Hanks justified meeting with the involved officers as part of her investigation into Rothe's death, not necessarily as part of an investigation into a crime.

89.    Upon information and belief, Commissioner Hanks instructed the involved officers to write revised statements regarding Mr. Rothe's death and what occurred on April 29, 2023. She also determined that CO Millar was not truthful about his involvement in Mr. Rothe's death.

90.    After these "use of force" review meetings, which doubled as "performance review" meetings, the involved staff, except CO Millar, were permitted to return to work, although some were reassigned to positions that did not involve working directly with the inmate/patient population.  CO Millar was terminated in December 2023.

91.    On February 8, 2024, CO Millar was charged with Second-Degree Murder for recklessly causing the death of Mr. Rothe under circumstances manifesting an extreme indifference to human life. He was later indicted for second degree murder in April 2023.

92. Upon CO Millar's charge and arrest, the involved officers were once again placed on administrative leave.

93. On February 27, 2024, after the Criminal Division charged CO Millar for the death of Mr. Rothe, Assistant Attorney Michael Grandy, the Civil Division attorney assigned to counsel the NHDOC, wrote to NHDOC and told them they could commence their internal review but they were not to take statements from witnesses.

94. Despite this directive, in April and May 2024, Commissioner Hanks and Director of Personnel Fallon Reed, personally interviewed Cpl. Cosgro, Cpl. Wright, CO Bissonnette, CO McDonough, and CO Sanchez again.

95. Both Commissioner Hanks and Director Reed took notes during these meetings, however, Commissioner Hanks shredded her notes after issuing disciplinary letters to Cpl. Cosgro, Cpl. Wright, and CO Reinholz.

96. Dir. Reed kept records of her notes from the meetings, which amounted to a transcript of each interview. Much of what the officers said in their interviews was not reflected in the subsequent disciplinary letters issued by Commissioner Hanks.

97. The disciplinary letters, the notes from the meetings, and even the very fact that the meetings occurred, were not disclosed to the criminal division, until late February 2025.

Attorney General Investigation

98. Contemporaneously with the investigation being conducted by NHDOC, the NH State Police was conducting a criminal investigation.

99. During that investigation, investigators learned that the involved COs were trained in use of force, duty to intervene, interacting with inmates suffering from mental illness, and that

each had specialized training specific to the use of force and breathing, called "One Breath" training.

100.    "One Breath" training focuses on signs and symptoms that officers should be aware of when using force, and preventive measures that can be taken. This training was mandatory, and all officers had to complete it between January 1, 2021 and February 28, 2021.

101.    The training specifically indicated that there is a risk of death when pressure is applied to an inmate's back when the inmate is laying face down in the prone position.

102.    Investigators also learned that there were significant gaps in application of the training to real life scenarios, and that officers who were trained in these techniques did not utilize their training while working in the SPU.

103.    Over the course of the investigation, the COs gave multiple written statements, spoke with Commissioner Hanks on at least two occasions, provided testimony to the grand jury, and ultimately, testified at the trial of CO Millar.

104.    From the investigation and trial, it is clear that despite general use of force training, training on the duty to intervene, training on the use of the taser, training on policies related to the restraint and transport of inmates and the extraction of inmates from cells, officers held Mr. Rothe in a prone position for an extended period of time and knelt on his back while he was kept in a prone position, even after he was handcuffed and no longer struggling;  Mr. Rothe was then transported on a restraint stretcher to the four-point restraint room while prone; RN Fitzgerald did not order that he be placed in a recovery position; and no officer intervened to stop the excessive use of force.

Harm Suffered

105.    As a direct and proximate cause of the Defendants' unlawful conduct, Mr. Rothe suffered wrongful death, pain and suffering, fear, terror, emotional distress, and loss of enjoyment of life.

**COUNT I**
**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT; DUE PROCESS**
**(AGAINST THE COs)**

106.    All prior paragraphs are incorporated.

107.    The Fourteenth Amendment to the United States Constitution prohibits the deprivation of life, liberty, or property without due process.

108.    Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is liable at law and in equity.

109.    "Constitutional protections for individuals confined by the state, whether civilly or criminally, include the right to reasonable safety..." *Gomes v. US Dep't of Homeland Sec., Acting Sec'y*, 460 F. Supp. 3d 132, 145 (D.N.H. 2020).

110.    The Fourteenth Amendment protects "incarcerated prisoners and involuntarily committed mental patients from harm by a state actor," including harm in the form of excessive force. *Davis v. Rennie*, 264 F.3d 86, 97-98 (1st Cir. 2001).

111.    "The duties owed under the Due Process Clause to those who are detained civilly are at least as extensive as those owed under the Eighth Amendment to convicted inmates." *Gomes*, 460 F. Supp.3d at 145 (emphasis in original). *See also Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982) ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.").

112.    "If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine [civil detainees]—who may not be punished at all—in unsafe conditions." *Id.* (quoting *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982)) (alterations in original). In reaching this conclusion, the *Gomes* court treated those who were civilly detained, involuntarily committed, and pretrial detainees as all benefiting from the same protection under the Due Process Clause. *See generally Gomes*, 460 F. Supp. 3d at 145-46.

113.    Under the Fourteenth Amendment, "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n. 10 (1989)).

114.    Under the standard adopted in *Kingsley*, detainees (unlike convicted prisoners) cannot be punished at all, much less "maliciously and sadistically." *Kingsley*, 576 U.S. at 400-01 (quoting *Ingraham v. Wright*, 430 U.S. 651, 671–672, n. 40 (1977)).

115.    A detainee "asserting a claim under the Fourteenth Amendment need only show that the 'force purposely or knowingly used against him was objectively unreasonable.'" *Id*. at 397. *See also Davis*, 264 F.3d at 108 ("The usual standard for an excessive force claim brought by an involuntarily committed mental patient is whether the force used was "objectively reasonable" under all the circumstances.").

116.    These circumstances include the nature of the confinement: "it is not unusual for a seriously ill mental patient to act out physically in the controlled and confined setting of a hospital," therefore, conduct that falls within the norm of what officers charged with a patient's care is expected to handle must be considered in determining reasonableness of the officer's conduct. *Davis*, 264 F.3d at 108.

117. "[T]he state's duty to protect those it confines because of mental illness requires that force be used as sparingly as possible." *Id.* at 111.

118. Qualified immunity is not available when an officer violates a constitutional right, and that right is clearly established. *Id*. at 113.

119. A CO's qualified immunity with respect to force is aligned with that of an officer's use of force during an arrest: an officer "may use only such force as is reasonably necessary to effect an arrest or to defend himself or others from bodily harm." *Id.* at 115.

120. Force that is unreasonable, in this context, is excessive and unconstitutional, thus qualified immunity cannot apply.

121. When the COs determined that Mr. Rothe needed to be extracted, he was alone and secured in the Dayroom, unarmed, and posing no risk to himself or others prior to extraction. Instead of operating consistent with their own procedures, the COs attempted an extraction in a chaotic, unprepared, and understaffed manner.

122. The COs unreasonably and intentionally committed acts and omissions while acting under the color of state law that violated Mr. Rothe's rights as guaranteed by the United States Constitution by subjecting him to excessive force, where, among other physical acts, the COs: repeatedly struck him with closed fists around his body, face, and head, tased Mr. Rothe at least eight (8) times, put him in various holds and "locks," including those that constricted his airways, placed him in a prone position, struck him in the head, hand, and arm with a radio, restrained him by kneeling on his back, continued to restrain him face down after he was handcuffed, placed leg irons on him while he was handcuffed, prone, and still, moved him, face-down, cuffed, and shackled, onto a restraint stretcher, and placed him face-down, cuffed, and shackled onto a four-point restraint table.

123. A reasonable person in the COs' position would have known that their acts and omissions violated clearly established law guaranteeing the right to be free from excessive force and under the Fourteenth Amendment to the United States Constitution.

124. The COs violated Mr. Rothe's Fourteenth Amendment right to substantive due process by enacting unreasonable excessive force against him, ultimately resulting in his death.

125. Mr. Rothe suffered a loss of fundamental rights and his life as a result of these actions by the COs.

**COUNT II**
**SUPERVISORY LIABILITY FOR FAILURE TO TRAIN AND DISCIPLINE**
**(AGAINST CPL. COSGRO, CPL. WRIGHT, and COMMISSIONER HANKS)**

126. All prior paragraphs are incorporated.

127. The Fourteenth Amendment to the United States Constitution prohibits the deprivation of life, liberty, or property without due process.

128. Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is liable at law and in equity.

129. "Constitutional protections for individuals confined by the state, whether civilly or criminally, include the right to reasonable safety..." *Gomes v. US Dep't of Homeland Sec., Acting Sec'y*, 460 F. Supp. 3d 132, 145 (D.N.H. 2020).

130. The Fourteenth Amendment protects "incarcerated prisoners and involuntarily committed mental patients from harm by a state actor," including harm in the form of excessive force. *Davis v. Rennie*, 264 F.3d 86, 97-98 (1st Cir. 2001).

131. Under 42 U.S.C. § 1983, supervisors can be held liable for the actions of their subordinates when the supervisor's subordinate officer's act or failure to act deprived the person of a particular federal right if the supervisors' action or inaction "was affirmative[ly] link[ed] to

that behavior in the sense that it could be characterized as . . . gross negligence amounting to deliberate indifference." *Justiniano v. Walker*, 986 F.3d 11, 20 (1st Cir. 2021) (quoting *Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 514-15 (1st Cir. 2016)).

132.    Supervisors can be held liable under several theories, including: negligent retention, negligent assignment, negligent entrustment, failure to supervise properly, failure to direct, and failure to provide necessary training.

133.    Upon information and belief, the supervisors—Cpl. Cosgro and Cpl. Wright—had failed to train the COs on the Use of Force and/or Extraction policy at the time of Mr. Rothe's death.

134.    Specifically, Cpl. Cosgro had improperly executed extractions in violation of policy a number of times prior to April 29, 2023 by failing to ensure there was sufficient personnel to safely effectuate an extraction.

135.    Supervisors failed to train, instruct, and properly supervise COs on the Use of Force policy or Extraction policy as promulgated by the DOC.

136.    Commissioner Hanks held inappropriate investigative meetings on two separate occasions with the involved officers despite being noticed by the Attorney General that these COs were considered witnesses in investigations into Mr. Rothe's death.

137.    Commissioner Hanks failed to properly investigate the Use of Force deployed in Mr. Rothe's case, relying on incomplete reports, and completing performance reviews of the implicated COs. More outrageous, Commissioner Hanks then coached the implicated COs, instructing them to revise their statements, and destroyed their original statements. Commissioner Hanks also destroyed her own notes taken during these improper meetings. She then issued disciplinary letters to the COs, failing to include much of what was discussed in the improper

meetings in the letters themselves. This conduct was not disclosed to the Attorney General's Office's criminal division for nearly one year.

138. Such alarming behavior committed by Commissioner Hanks to minimize, conceal, or sanitize the criminally charged conduct that caused the death of Mr. Rothe demonstrates a tacit approval or ratification of the conduct.

139. The aforementioned supervisors' conduct, as well as additional conduct listed in the above Complaint, put the supervisors on reasonable notice that was sufficient to alert them to ongoing violations or a high likelihood that their officers would violate a person's Constitutional rights.

140. The supervisors' conduct led inexorably to the constitutional violations of Mr. Rothe when the officers attacked, restrained, and killed him.

141. Mr. Rothe suffered serious bodily injury and death, as well as a loss of fundamental rights as a result of these actions by the supervisors.

## COUNT III
### 42 U.S.C. § 1983 – FAILURE TO INTERVENE - FOURTEENTH AMENDMENT; EXCESSIVE FORCE
### (AGAINST THE COs and RN FITZGERALD)

142. All prior paragraphs are incorporated.

143. The Fourteenth Amendment to the United States Constitution prohibits the deprivation of life, liberty, or property without due process.

144. Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is liable at law and in equity.

145. "Constitutional protections for individuals confined by the state, whether civilly or criminally, include the right to reasonable safety..." *Gomes*, 460 F. Supp. 3d at 145.

146.    The Fourteenth Amendment protects "incarcerated prisoners and involuntarily committed mental patients from harm by a state actor," including harm in the form of excessive force. *Davis*, 264 F.3d at 97-98.

147.    "An officer may be held liable not only for his personal use of excessive force, but also for his failure to intervene in appropriate circumstances to protect an arrestee from the excessive use of force by his fellow officers." *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64 (1st Cir. 2016) (citing *Wilson v. Town of Mendon*, 294 F.3d 1, 6 (1st Cir. 2002)).

148.    The First Circuit has extended this duty to require "that a prison guard must intervene when another guard uses excessive force against a prisoner." *Davis,* 264 F. 3d at 114.

149.    "For involuntarily committed patients, 'a set of unique rules has developed' according to which 'failures to act ... may comprise a due process or other constitutional violation because the state-imposed circumstance of confinement prevents such individuals from helping themselves[,]'" creating an affirmative duty on the state to protect such individuals. *Id.*, at 98 (quoting *Hasenfus v. LaJeunesse,* 175 F.3d 68, 71 (1st Cir.1999)).

150.    Here, the COs and RN Fitzgerald each failed to intervene to protect Mr. Rothe from the use of excessive force by each of the other COs—despite their ample opportunity to do so—when the COs repeatedly tased, struck, knelt-on, cuffed, shackled, restrained, and otherwise attacked Mr. Rothe.

151.    The COs made no attempts to assess the situation at the outset of the attempted extraction, nor did they attempt to de-escalate it at any point after opening the door.

152.    Upon information and belief, at no point did any of the COs present, despite the approximate ten (10) minute duration of the attack, ever attempt to stop—or instruct any of the other officers to cease—the use of physical force.

153. Upon information and belief, at no point did any of the officers present, despite the approximate ten (10) minute duration of the attack, ever attempt to assess the totality of the circumstances to determine whether any additional force was required, and if so, what level of force was appropriate.

154. Rather, as each CO arrived, they immediately began applying additional force, beginning with Cpl. Wright and Cpl. Cosgro repeatedly punching and tasing Mr. Rothe, CO McDonough pulling his hair and yanking him to the ground, CO Bissonnette abandoning her role filming the attack in order to further grab at Mr. Rothe's limbs, CO Millar grabbing Mr. Rothe, rolling him onto his face, and kneeling on his back before and after Mr. Rothe was handcuffed, and CO Sanchez moving Mr. Rothe's shackled and still face-down body onto the restraint stretcher.

155. Not only did the COs fail to intervene, they escalated the initial assault.

156. Despite having ample opportunity to do so, the COs each failed to intervene to stop the deprivation of Mr. Rothe's federally protected rights.

157. Mr. Rothe suffered serious bodily injury and death, as well as a loss of fundamental rights as a result of these actions by the COs.

**STATE LAW CLAIMS**
**COUNT IV**
**WRONGFUL DEATH**
**(AGAINST THE COs, RN FIZTGERALD, AND NHDOC)**

158. There is a cause of action for wrongful death if the death is caused by the wrongful or negligent act of the defendant. N.H. RSA 556:12.

159. The COs wrongfully used unreasonable force, failed to follow their own procedures, dangerously engaged in restraint and compression far outside of the bounds of the standards for a CO, and failed to intervene, de-escalate, or render aid to Mr. Rothe.

160.    Such actions were in conscious disregard of the risk of injury and death under the circumstances.

161.    The COs' failure to exercise reasonable care was the proximate cause of Mr. Rothe's death.

162.    At the time of the incident, the COs and RN Fitzgerald were employed by NHDOC. The relevant acts and omissions occurred within the scope of their employment.  Thus, under the doctrine of *respondeat superior*, NHDOC is vicariously liable for the torts committed by the COs and RN Fitzgerald during the course of their employment.

163.    Mr. Rothe suffered significant bodily injury, death, and a loss of fundamental rights as a result of these actions by the COs.

## COUNT V
## ASSAULT AND BATTERY
## (AGAINST THE COs and NHDOC)

164.    All prior paragraphs are incorporated.

165.    The COs intended to cause harmful or offensive contact with Mr. Rothe and placed him in imminent apprehension of such contact as they charged him to effectuate extraction before making contact with Mr. Rothe.

166.    The COs intended to make contact with Mr. Rothe at the time they attempted to extract him, wrestled him to the ground, pinned him, struck him, tased him, and knelt on top of him, placed handcuffs and shackles on him, and strapped him to a restraint stretcher.

167.    Such contact is offensive to a reasonable person.

168.    Such contact was not consensual.

169. Such contact was not legally authorized, despite the COs' roles as correctional officers, because it was excessive, unreasonable, and in violation of the DOC's procedures.

170. The State of New Hampshire is vicariously liable for its officers' intentional actions. *See Huckins v. McSweeney*, 166 N.H. 176, 182 (2014).

171. Mr. Rothe suffered significant bodily injury, death, and a loss of fundamental rights as a result of these actions by the COs.

**DEMAND FOR JURY TRIAL**

Plaintiff requests a trial by jury on all issues triable by jury.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff Aimee Khatib, as the Personal Representative of the Estate of Jason Rothe, respectfully requests this Court grant the following relief:

A.   Monetary damages;

B.   Punitive damages;

C.   Cost, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988(b) and New Hampshire law;

D.   All relief available to Mr. Rothe under any applicable law; and

E.   Any other relief that this Court deems just or equitable.

- 32 -

Date: April 15, 2026

Respectfully submitted,

/s/ *D. Michael Noonan*
D. MICHAEL NOONAN
NH Bar #8214
LEAH COLE DURST
NH Bar #273679
SHAHEEN & GORDON, P.A.
P.O. Box 977
Dover, NH  03821
(603) 749-5000
mnoonan@shaheengordon.com
ldurst@shaheengordon.com
*Attorneys for Plaintiff, Estate of Jason Rothe*